# United States Court of Appeals

## For the Eighth Circuit

_____

No. 14-3658

_____

David Stults; Barbara Stults

*Plaintiffs - Appellants*

v.

American Pop Corn Company; ConAgra Foods, Inc.; General Mills, Inc.;
Givaudan Flavors Corporation

*Defendant*s

International Flavors & Fragrances, Inc.

*Defendant - Appellee*

Sensient Flavors, LLC

*Defendant*

Bush Boake Allen Inc.

*Defendant - Appellee*

Symrise Inc.; CHR. Hansen, Inc.; Firmenich, Inc.; John Does 1-20

*Defendant*s

_____

Appeal from United States District Court
for the Northern District of Iowa - Sioux City

_____

Submitted: October 22, 2015
Filed: March 4, 2016

_____

Before RILEY, Chief Judge, SMITH and SHEPHERD, Circuit Judges.

_____

RILEY, Chief Judge.

David Stults (Stults) consumed one to three bags of microwave popcorn each day for approximately twenty years. In 2009, Stults was diagnosed with the lung disease bronchiolitis obliterans, which he attributes to his consumption of a chemical used to give the popcorn its butter flavor. In this diversity action, Stults and his wife Barbara (the Stultses), residents of Michigan, sued numerous makers and distributors of microwave popcorn and butter flavoring, alleging their products caused Stults's disease. See 28 U.S.C. § 1332(a)(1). This appeal pertains only to International Flavors & Fragrances, Inc., a New York corporation, and its subsidiary, Bush Boake Allen Inc., a Virginia and New York corporation (collectively, IFF). After a jury found in favor of IFF, the Stultses moved for judgment as a matter of law or a new trial. The district court[1] denied the motions, and the Stultses appeal. Having jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

## I.     BACKGROUND

Stults ate a lot of popcorn. For approximately twenty years, he practiced "a ritual of slowly opening the freshly-popped bag as he breathed the aroma in through his nose" one to three times per day. Stults originally estimated he stopped eating popcorn around 2004, but later gave conflicting accounts of his popcorn consumption history. A chemical named diacetyl that IFF once used in a butter flavoring for

_____

[1]The Honorable Mark W. Bennett, United States District Judge for the Northern District of Iowa.

-2-

microwave popcorn has been shown to cause bronchiolitis obliterans, at least in workers who are exposed to industrial quantities of diacetyl over long durations.

The Stultses sued numerous makers and distributors of microwave popcorn and butter flavoring on theories of strict liability, negligence, and breach of implied warranty under Michigan law. Only the Stultses' breach-of-implied-warranty claim against IFF, with a related loss-of-consortium claim, went to trial. IFF asserted, among others, affirmative defenses of sole proximate cause and fault of others.

At trial, a number of expert witnesses agreed Stults has bronchiolitis obliterans. Opinions differed as to whether the condition was caused by diacetyl exposure or an unrelated autoimmune disease. One of the Stultses' expert witnesses, Dr. David Egilman, testified Stults's bronchiolitis obliterans was caused by his inhalation of microwave popcorn fumes containing diacetyl. Dr. Egilman acknowledged he wrote the only published article supporting the theory that consumers—as opposed to industrial workers—can get bronchiolitis obliterans from diacetyl. The article appeared in a journal he edited.

The Stultses presented testimony from a second witness, Dr. Allen Parmet, an occupational medicine expert who was familiar with bronchiolitis obliterans among popcorn plant workers. He testified diacetyl was "the most probable cause" of Stults's condition. The Stultses' third expert witness, pulmonologist Dr. Charles Pue, testified Stults "definitely" had enough exposure to diacetyl to cause bronchiolitis obliterans and his condition was "consistent with bronchiolitis obliterans caused by diacetyl."

IFF's theory was that Stults's bronchiolitis obliterans was caused by a rheumatoid, autoimmune condition unrelated to diacetyl exposure. One of IFF's expert witnesses, Dr. Paul Wolters, testified Stults likely had an autoimmune condition, based on his complaints of several potentially autoimmune symptoms in

2008-2010. Dr. Wolters did not believe diacetyl was the culprit because Stults's symptoms did not develop until several years after he stopped eating microwave popcorn regularly.

IFF also presented evidence from Dr. Richard Meehan, a rheumatologist who testified Stults had rheumatoid arthritis. Before Dr. Meehan testified, the parties disputed whether Dr. Meehan had considered diacetyl in his differential diagnosis. The district court permitted Dr. Meehan to testify to see if IFF could lay a proper foundation after IFF's counsel averred, "I'm confident you're going to be satisfied." When Dr. Meehan took the stand, he began to testify about articles that had never been provided to the Stultses' counsel and the Stultses' counsel objected. The jury was excused and it came to light that Dr. Meehan had done additional research to prepare for trial unbeknownst to IFF's counsel. The district court said

> I think I would be well within my discretion to exclude the witness . . . . Wouldn't even be a close call. But . . . as an alternative to doing that . . . his testimony has to be limited to his disclosure report . . . . And no one can ask him obviously about these additional articles. He can't refer at all to these additional articles. And I know it's virtually impossible, but you have to try and put them out of your head when you answer and try and answer as if it was before you read the articles. You know, it's inhuman to ask that. All I can do is ask you to do the best you can.

Dr. Meehan resumed his testimony before the jury. He testified he had not considered whether diacetyl had caused Stults's bronchiolitis obliterans because "he had enough criteria of a systemic autoimmune disease that whether or not he used popcorn was really irrelevant." Following this concession that he had failed to conduct a proper differential diagnosis, the district court struck all of Dr. Meehan's testimony. The jury was instructed: "I have just stricken all of Dr. Meehan's

-4-

testimony. You're not to speculate as to the reason or reasons why. But you are instructed that you have to disregard all of his testimony."

The jury also heard deposition testimony from Dr. Richard Switzer, Stults's primary-care physician since 1993. Stults had reported several potentially rheumatoid symptoms to Dr. Switzer over the years, and Dr. Switzer referred him to a rheumatologist in 2008. Dr. Switzer testified he had no opinion as to whether Stults's diacetyl exposure caused his bronchiolitis obliterans.

Stults's rheumatologist, Dr. Aaron Eggebeen, described Stults's condition as a non-specified atypical presentation of "a form of rheumatoid lung disease" or "potentially a connective tissue disease." Stults had alerted him to the potential diacetyl connection, but Dr. Eggebeen could not identify a source of Stults's disease. He testified, "[w]hether or not the diacetyl has anything to do with it, I'm not sure how to judge that."

IFF also presented Dr. Coreen Robbins, an industrial hygienist who testified "consumer exposure to diacetyl from popping microwave popcorn is insignificant." She testified about an "experiment" in which she popped popcorn to see when she could put her nose in the bag, which she determined to be approximately one minute. She also measured the temperature of the air coming out of the bag and determined "[y]ou really can't stick your nose right in it" because it is too hot. The experiment portion of her testimony was stricken and the jury was instructed

> there are just too many dissimilarities between what she did and what Mr. Stults was doing. We don't have the same popcorn bags. We don't have the same strength [microwave]. We don't know how long it was cooked for. There's just a whole lot of variables that aren't the same or similar enough to make it admissible evidence.

Following a jury verdict in favor of IFF, the Stultses moved for judgment as a matter of law or a new trial. The Stultses sought a new trial based on Dr. Meehan's and Dr. Robbins's stricken testimony and Dr. Wolters's admitted testimony, arguing the jury was improperly influenced by it despite the limiting instructions. The Stultses based this assertion in part on juror interviews conducted after the trial. The Stultses requested, as an alternative to a new trial, an evidentiary hearing to determine whether juror misconduct occurred. The Stultses argued they were entitled to judgment as a matter of law because "three elements of [their] breach of implied warranty claim were not disputed and should not have been submitted to the jury." Finally, the Stultses asserted they were entitled to judgment as a matter of law because IFF failed to prove its affirmative defenses of sole proximate cause and fault of others. The district court denied the motions, and the Stultses appeal.

## II.   DISCUSSION
### A.   New Trial

A new trial may be granted on all or some issues "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). We review the district court's "denial of a new trial for a 'clear abuse of discretion,' reversing only 'to prevent a miscarriage of justice.'" Behlmann v. Century Sur. Co., 794 F.3d 960, 963 (8th Cir. 2015) (quoting Burris v. Gulf Underwriters Ins. Co., 787 F.3d 875, 878 (8th Cir. 2015)).

The Stultses assert "the district court erred in denying the Stultses [sic] motion for a new trial because the jury was allowed to hear improper testimony from IFF/BBA'[s] retained experts" and because the verdict was against the weight of the evidence. According to the Stultses, they are entitled to a new trial because "'improper questioning by counsel generally entitles the aggrieved party to a new trial if it conveys improper information to the jury and prejudices the opposing litigant.'" Blair v. Wills, 420 F.3d 823, 829 (8th Cir. 2005) (alteration omitted) (quoting Silbergleit v. First Interstate Bank of Fargo, N.A., 37 F.3d 394, 398 (8th Cir. 1994)).

-6-

"In appraising prejudicial remarks and conduct . . . , the court must consider 'the climate of the contest in which it occurred.'" Sanders-El v. Wencewicz, 987 F.2d 483, 485 (8th Cir. 1993) (quoting Westchester Fire Ins. Co. v. Hanley, 284 F.2d 409, 416 (6th Cir. 1960)). Relevant factors include the closeness of the case, whether counsel acted in good faith, and whether the jury was left with the wrong impression. Cf. id.

### 1. Dr. Meehan's Testimony

The Stultses first argue they are entitled to a new trial because Dr. Meehan's stricken testimony was prejudicial, suggesting "[t]he significant amount of evidence in [the Stultses'] favor demonstrates the prejudicial effect the improper testimony had." The Stultses also claim IFF's counsel "intentionally chose not to be candid with the Court and instead took any position necessary to get Dr. Meehan's testimony in front of the jury." The Stultses maintain the district court's curative instruction was insufficient because it "told the jury to put [Dr. Meehan's] testimony out of their minds while admitting to them it knew that was impossible. Adding even more confusion to the issue the court said Dr. Meehan had done nothing wrong." The Stultses propose the jury was left with the impression "Dr. Meehan was a saint whose only mistake was to continue researching on the topic beyond some arbitrary court-imposed deadline." Finally, the Stultses contend they were entitled to an evidentiary hearing because some jurors stated during post-trial interviews they had relied on Dr. Meehan's stricken testimony. We address the Stultses' arguments in turn.

First, because the Stultses failed to object to the district court's curative instruction concerning Dr. Meehan's testimony, they forfeited any error "absent a showing of plain error." Horstmyer v. Black & Decker, (U.S.), Inc., 151 F.3d 765, 771 (8th Cir. 1998). "'Plain error is a stringently limited standard of review,' especially in the civil context, and must result in a miscarriage of justice in order to compel reversal." Id. (quoting Rush v. Smith, 56 F.3d 918, 925 (8th Cir. 1995) (en banc) (Magill, J., dissenting)). "We normally presume that a jury will follow an

instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions." Greer v. Miller, 483 U.S. 756, 766 n.8 (1987) (quoting Richardson v. Marsh, 481 U.S. 200, 208 (1987)).

We are not convinced there was "an overwhelming probability" the jury could not follow the curative instruction provided here. See id. Although the Stultses are technically correct that Dr. Meehan was "the only witness to testify that Mr. Stults has rheumatoid arthritis," three other witnesses were in substantial agreement that Stults's bronchiolitis obliterans was related to an autoimmune or rheumatoid process. Cf., e.g., Winter v. Novartis Pharm. Corp., 739 F.3d 405, 411 (8th Cir. 2014) (explaining it is harmless error to *admit* inadmissible evidence that is cumulative of admissible evidence). Dr. Wolters testified Stults's condition was caused by an autoimmune disorder, not diacetyl exposure. And Stults's two treating physicians agreed Stults suffered from an autoimmune disorder, and they did not connect his disease to diacetyl. Finally, although what happened during Dr. Meehan's testimony is perplexing, we are not persuaded it was an intentional attempt by defense counsel to put inadmissible evidence in front of the jury.

Second, the district court did not abuse its discretion by denying the Stultses' request for an evidentiary hearing. See, e.g., United States v. Johnson, 495 F.3d 951, 981 (8th Cir. 2007) ("'The district court has broad discretion in managing juror misconduct allegations, and its decision whether to conduct an evidentiary hearing over such allegations will be affirmed absent an abuse of discretion.'" (quoting United States v. Wintermute, 443 F.3d 993, 1002 (8th Cir. 2006))). Federal Rule of Evidence 606(b)(1) provides: "During an inquiry into the validity of a verdict . . . a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict." There are exceptions permitting a juror to testify "about whether . . . extraneous prejudicial information was

improperly brought to the jury's attention . . . [or] an outside influence was improperly brought to bear on any juror." Fed. R. Evid. 606(b)(2)(A), (B).

We have described "extraneous information" as "objective events such as 'publicity and extra-record evidence reaching the jury room, and communication or contact between jurors and litigants, the court, or other third parties.'" Warger v. Shauers, 721 F.3d 606, 611 (8th Cir. 2013) (quoting United States v. Krall, 835 F.2d 711, 716 (8th Cir. 1987)), aff'd 574 U.S. ___, ___, 135 S. Ct. 521, 525 (2014). Stricken testimony does not constitute "extraneous information." There is no need for a juror to testify about "whether" stricken testimony was "brought to the jury's attention." See Fed. R. Evid. 606(b). The *existence* of the stricken testimony is not in doubt. Rather, a juror's testimony that the jury relied on stricken evidence is precisely what is barred by Rule 606(b): testimony concerning "the *effect* of anything on that juror's or another juror's vote; or any juror's mental processes." Id. (emphasis added); see also Warger v. Shauers, 574 U.S. ___, ___, 135 S. Ct. 521, 528 (2014) ("[T]he 'inquiry' to which the Rule refers is one into the '*validity* of the verdict,' not into the verdict itself. The Rule does not focus on the means by which deliberations evidence might be used to invalidate a verdict.").

Furthermore, the Stultses' position is at odds with the purpose of Rule 606(b). Permitting inquiry into whether jurors failed to disregard stricken testimony would invite scrutiny into many jury verdicts and seriously undermine the finality of verdicts. See Warger, 721 F.3d at 612 ("In order to achieve finality in the litigation process and avoid relentless post-verdict scrutiny and second guessing, occasional inappropriate jury deliberations must be allowed to go unremedied."). The district court did not abuse its discretion by denying the Stultses' motion for an evidentiary hearing.

## 2. Dr. Robbins's Testimony

The Stultses next theorize "the improper testimony of Dr. Robbins required a new trial" because her "experiment" did "not constitute scientific knowledge" and "invaded the province of the jury because it went to [Stults's] credibility." The district court concluded the Stultses forfeited this claim because they failed to make a contemporaneous objection. When the district court struck Dr. Robbins's testimony about her popcorn bag experiment, it asked if "the parties [were] satisfied with that explanation" and the Stultses' counsel said yes. Because the Stultses failed to object to the district court's decision to exclude only a portion of Dr. Robbins's testimony, they forfeited any error "absent a showing of plain error." Horstmyer, 151 F.3d at 771. We identify no plain error in the district court's decision to admit the rest of Dr. Robbins's testimony or its prompt and thorough curative instruction concerning the stricken testimony. See, e.g., Greer, 483 U.S. at 766 n.8.

## 3. Dr. Wolters's Testimony

The Stultses next argue the "improper testimony of Dr. Wolters requires a new trial" "because he did not adequately rule out diacetyl as the cause of [Stults's] bronchiolitis obliterans." The Stultses correctly observe "[a] failure to consider alternative potential causes of an injury or symptom can render a differential diagnosis scientifically invalid." Tedder v. Am. Railcar Indus., Inc., 739 F.3d 1104, 1109 (8th Cir. 2014). According to the Stultses,

> Dr. Wolters did not rule out diacetyl, instead he testified that he did not know whether or not diacetyl could cause bronchiolitis obliterans. . . . He needed to affirmatively consider it and rule it out. . . . [H]e did not do this because he does not believe diacetyl can cause bronchiolitis obliterans. So, put in a spot on the stand he took a shot at ruling it out . . .

Dr. Wolters was asked at trial whether he had considered the possibility Stults's lung disease was caused by diacetyl in microwave popcorn and Dr. Wolters

-10-

replied, "In my opinion, yes, I was able to rule it out." He proceeded to explain his reasons for this conclusion, including the fact that Stults's "disease state occurred at a time when he was not eating much popcorn, if any at all, per his deposition." The Stultses allege Dr. Wolters expressed incorrect medical opinions and "Dr. Egilman confirmed this on rebuttal." It is the province of the jury to decide which experts are more credible and persuasive. See, e.g., United States v. Hodge, 594 F.3d 614, 618 (8th Cir. 2010) ("A jury's credibility determinations are well-nigh unreviewable because the jury is in the best position to assess the credibility of witnesses and resolve inconsistent testimony."). The Stultses' disagreement with why Dr. Wolters ruled out diacetyl as a cause of Stults's illness is far from grounds for a new trial. See, e.g., Behlmann, 794 F.3d at 963.

### 4.    Weight of the Evidence

Finally, the Stultses suggest they are entitled to a new trial because the verdict was against the weight of the evidence. See, e.g., White v. Pence, 961 F.2d 776, 780 (8th Cir. 1992). The Stultses assert "Dr. Meehan was the only witness willing to testify to IFF/BBA [sic] theory of the case: that Mr. Stults' bronchiolitis obliterans was caused by rheumatoid arthritis. . . . Without this testimony, there was nothing to support a sufficient defense." The Stultses cite no record evidence or legal authority in support of this claim, and their cursory argument suggests they misapprehend the burden of proof in this case. See, e.g., Gregory v. Cincinnati Inc., 538 N.W.2d 325, 329 (Mich. 1995) ("A breach of warranty claim tests the fitness of the product and requires that the plaintiff 'prove a defect attributable to the manufacturer and causal connection between that defect and the injury or damage of which he complains.'" (quoting Piercefield v. Remington Arms Co., 133 N.W.2d 129, 135 (Mich. 1965))). As IFF emphasizes, the Stultses had the burden to prove each element of their breach-of-implied-warranty claim by a preponderance of the evidence. See, e.g., Barefield v. La Salle Coca-Cola Bottling Co., 120 N.W.2d 786, 788 (Mich. 1963) (discussing with approval the district court's instructions concerning the burden of proof in a breach-of-implied-warranty action).

-11-

Contrary to the Stultses' assertion that IFF failed to "support a sufficient defense," IFF in fact had no obligation to rebut a presumption Stults's bronchiolitis obliterans was caused by diacetyl. See, e.g., Gregory, 538 N.W.2d at 329; Barefield, 120 N.W.2d at 788. IFF advances several reasons the jury could have decided the Stultses failed to meet their burden, such as Stults's "overall lack of credibility, as demonstrated by the insincerity with which he changed his popcorn consumption history to make it coincide with the time his lungs were deteriorating" and the weaknesses in Dr. Egilman's testimony. The Stultses, on the other hand, do not point to any specific evidence in the record to support their assertion that the evidence favored them "overwhemingly." We conclude the district court did not abuse its discretion because the Stultses have failed to show "'the outcome is against the great weight of the evidence so as to constitute a miscarriage of justice'" necessitating a new trial. See Warger, 721 F.3d at 610 (quoting Bair v. Callahan, 664 F.3d 1225, 1230 (8th Cir. 2012)).

### B.      Judgment as a Matter of Law

"Judgment as a matter of law is appropriate when 'there is no legally sufficient evidentiary basis for a reasonable jury to find for [the prevailing] party,'" Wash Solutions, Inc. v. PDQ Mfg., Inc., 395 F.3d 888, 892 (8th Cir. 2005) (quoting Fed. R. Civ. P. 50(a)(1) (2005) (amended 2006)), that is, "all of the evidence points one way and is 'susceptible of no reasonable inference sustaining the position of the nonmoving party.'" Howard v. Mo. Bone & Joint Ctr., Inc., 615 F.3d 991, 995 (8th Cir. 2010) (quoting Keenan v. Comput. Assocs. Int'l, Inc., 13 F.3d 1266, 1269 (8th Cir. 1994)). In deciding a motion for judgment as a matter of law, the court shall

> (1) resolve direct factual conflicts in favor of the nonmovant, (2) assume as true all facts supporting the nonmovant which the evidence tended to prove, (3) give the nonmovant the benefit of all reasonable inferences, and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn.

Jones v. Edwards, 770 F.2d 739, 740 (8th Cir. 1985) (quoting Lackawanna Leather Co. v. Martin & Stewart, Ltd., 730 F.2d 1197, 1200 (8th Cir. 1984)). We conduct de novo review. See Amerinet, Inc. v. Xerox Corp., 972 F.2d 1483, 1504-05 (8th Cir. 1992).

The Stultses claim they are entitled to judgment as a matter of law because "three elements of [their] breach of implied warranty claim were not disputed and should not have been submitted to the jury." It appears the Stultses are referring to the questions of whether: (1) "diacetyl fumes emitted from the heated butter flavoring were potentially hazardous to breathe," (2) "[d]iacetyl-free butter flavorings, which did not emit fumes that were potentially hazardous to breathe, were available for use in microwave popcorn," and (3) "the butter flavorings were in [the popcorn Stults ate] at the time that David Stults was injured."

These issues were not uncontested. As IFF points out, its position "concerning any hazards arising from heated diacetyl fumes was repeatedly, and steadfastly, limited to the workplace environment . . . where large amounts of chemical flavorings existed in vats." There was also conflicting evidence from Stults himself concerning the timing of his microwave popcorn consumption in relation to the onset of his disease. These factual disputes were properly submitted to the jury. See, e.g., Hunt v. Neb. Pub. Power Dist., 282 F.3d 1021, 1029 (8th Cir. 2002) ("Where conflicting inferences reasonably can be drawn from the evidence, it is the role of the jury, not the court, to determine which inference shall be drawn.").

Second, in the Stultses' view, the district court should have granted judgment as a matter of law because IFF "did not present evidence to support the sole proximate cause defense" or "the fault of others defense." As the jury verdict form—which the Stultses do not challenge—clearly indicated, it was unnecessary for the jury to proceed to the question of affirmative defenses because the jury found in

-13-

IFF's favor on the Stultses' breach-of-implied-warranty claim. The Stultses cite no legal authority supporting their improbable proposition. We find none.

## III.  CONCLUSION

The judgment of the district court is affirmed.

_____